[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 27, 2011
JOHN LEY
CLERK

No. 10-10684
Non-Argument Calendar
_____

D.C. Docket No. 6:08-cv-01349-GAP-DAB

ALBERT ALUNNI,
CONNIE ALUNNI,
ANNAMARIE ALUNNI,
JAVED ASLAM,
DARLENE ASLAM,
RONALD AUSTIN,
SHIRLEY M. AUSTIN,
DANIEL BONKOWSKI,
ANDREA BONKOWSKI,
CARL E. BYER, et al.,

Plaintiffs-Appellants,

versus

DEVELOPMENT RESOURCES GROUP, LLC,
a Florida limited liability company,
LEGACY DUNES CONDOMINIUM, LLC,
a Florida limited liability company,
MICHAEL K. HALPIN,
JAMES E. WEAR,
THE REAL ESTATE INVESTMENT GROUP, LTD.,
an Illinois corporation, et al.,

Defendants-Appellees.

_____

No. 10-12174
Non-Argument Calendar
_____

D.C. Docket No. 6:09-cv-02056-GAP-GJK

ADRIANNE ROGGENBUCK TRUST,
REBECCA G. AUREUS,
DAVE BOEHM,
TAMMY BOEHM,
LISA K. DACOSTA,
DELORES GLASBRENNER,
MARVIN GLASBRENNER,
MARK R. HENDERSON,
BRADLEY JAMES,
JOYCE JAMES,
GEORGE M. KVECK,
MARYANNE B. KVECK,
EUGENE MACKIN,
FRANCES MACKIN,
DONALD C. MARZKE,
SANDRA PAULU,
ADRIANNE ROGGENBUCK,
SERIES 8-301 LEGACY OF THE KJV HOLDINGS, LLC,
an Illinois Limited Liability Company,
KEN VOJTIK, SR.,
BETTY VOJTIK,

Plaintiffs-Appellants,

versus

DEVELOPMENT RESOURCES GROUP, LLC,

2

LEGACY DUNES CONDOMINIUM, LLC,
A Florida Limited Liability Company,
MICHAEL K. HALPIN,
JAMES E. WEAR,
TIMOTHY S. TINSLEY, et al.,

                                        Defendants-Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(October 27, 2011)

Before HULL, WILSON and BLACK, Circuit Judges.

PER CURIAM:

These consolidated appeals arise from the sale of condominium units in the

Legacy Dunes condominium complex ("Legacy Dunes") in Kissimmee, Florida.[1]

The plaintiffs, who purchased Legacy Dunes units, alleged the defendants violated

federal and state securities laws in connection with the sales. The district court

concluded the securities laws did not apply to the condominium sales at issue

because the sales did not constitute "investment contracts," and thus were not

---

[1]We consolidated two appeals, Alunni v. Development Resources Group, LLC, No. 10-10684, District Court Docket No. 6:08-CV-1349 (M.D. Fla.) (complaint filed Aug. 8, 2008), and Adrianne Roggenbuck Trust v. Development Resources Group, LLC, No. 10-12174, District Court Docket No. 6:09-CV-2056 (M.D. Fla.) (complaint filed Dec. 7, 2009). We refer to them as the "Alunni lawsuit" and the "Roggenbuck lawsuit."

"securities." The district court granted summary judgment to the defendants, and the plaintiffs appealed. After review, we affirm.

## I. BACKGROUND

### A. The Parties

This consolidated appeal involves parties in the Alunni lawsuit and the Roggenbuck lawsuit, as explained below.

In the Alunni case, Albert Alunni and 97 others (a collection of individuals, trusts, and limited liability companies) brought this lawsuit against 14 defendants involved in the marketing and sale of the Legacy Dunes units. In the Roggenbuck case, the Adrianne Roggenbuck Trust, one limited liability company, and 18 individuals brought a similar lawsuit against 15 defendants. The plaintiffs in both cases purchased one or more condominium units in Legacy Dunes. Most of the plaintiffs live in or around Chicago, Illinois.

The defendants include Development Resources Group, LLC ("DRG"); Legacy Dunes Condominium, LLC ("LDC"); Real Estate Dreams, LLC ("RED"); The Real Estate Investment Group, Ltd. ("REIG"); and Geneva Hospitality Management, LLC ("Geneva"); as well as various officers and principals of DRG, LDC, RED, REIG, and Geneva.

Defendant DRG is an Orlando, Florida-based company engaged in the

development and sale of condominium projects in Florida.  In January 2006, DRG formed LDC to purchase Legacy Dunes, a 488-unit apartment complex in Kissimmee, Florida, and to convert Legacy Dunes into a condominium.

To market Legacy Dunes, LDC (the owner) entered into a brokerage agreement with RED, a Florida real estate brokerage company.  RED, in turn, contracted with REIG, an Illinois real estate brokerage company, to market Legacy Dunes to potential buyers in Chicago.  REIG's principal is defendant Joseph Aldeguer, who had a Saturday morning radio program in Chicago called "Making Money in Real Estate with Joseph Aldeguer."  REIG and Aldeguer promoted Legacy Dunes on Aldeguer's radio show and through real estate workshops in Chicago.

Defendant Geneva is a Wisconsin-based property management company that worked with REIG and Aldeguer at the real estate workshops.  Geneva ultimately did not serve as property manager at Legacy Dunes.

B.    **Purchase and Conversion of Legacy Dunes**

In February 2006, LDC contracted to purchase the Legacy Dunes apartment complex, and it consummated the purchase on June 27, 2006.  A few days after closing, LDC filed a declaration of condominium, converting Legacy Dunes to a condominium.  When LDC did so, it created the Legacy Dunes condominium

association, a separate corporation that is not a party in these cases.

LDC controlled the condominium association for three months. On September 30, 2006, LDC turned over control of the Legacy Dunes condominium association to the unit owners.

When LDC bought Legacy Dunes, approximately 94% of the units were occupied by tenants with long-term (one or two year) leases. Before the sale to LDC, Legacy Dunes's owner operated the complex's leasing office.

On June 27, 2006, the day it purchased Legacy Dunes, LDC entered into a contract (the "leasing agreement") with Sovereign Residential Services, LLC ("Sovereign"). The leasing agreement stated that LDC appointed Sovereign as "the sole and exclusive leasing agent" for all Legacy Dunes units offered for lease. The leasing agreement stated that LDC "represents and warrants that all homeowners of [Legacy Dunes] are required to use [Sovereign] for any leasing of their premise in [Legacy Dunes]." LDC agreed "that all inquiries for any lease(s) or renewal(s) for the leasing of [Legacy Dunes] shall be referred to [Sovereign] and all negotiations connected therewith shall be conducted by or under the direction of [Sovereign]."

The leasing agreement obligated Sovereign to "use reasonable efforts to lease available units within [Legacy Dunes] as expeditiously as possible" at rates

6

approved by LDC, as well as to collect rent from tenants on behalf of the unit owners. LDC paid the entire cost of the rental management services provided by Sovereign.

The leasing agreement with Sovereign was exclusively for long-term (i.e., greater than seven months) leasing of Legacy Dunes units. Although local zoning regulations permitted short-term rentals, Legacy Dunes's declaration of condominium did not. Neither LDC nor DRG ever engaged management for short-term leasing.

The leasing agreement between LDC and Sovereign was for a one-year term and expired in 2007.

## C.      Marketing and Promotion of Legacy Dunes Condominium Units

In the spring of 2006, LDC, REIG, and Aldeguer began marketing the Legacy Dunes condominium units. Plaintiffs first heard about Legacy Dunes on Aldeguer's radio show, and they were invited to attend real estate workshops at The Mortgage Exchange ("TME"), a mortgage brokerage company in Chicago owned and run by Aldeguer.[2] Three workshops were held, one each in May, June, and July 2006. About 100 to 150 people attended each workshop, where they

---

[2]At the time the Alunni and Roggenbuck lawsuits were filed, TME was in bankruptcy proceedings. TME was not made a party to either lawsuit.

were solicited to buy Legacy Dunes units.

At the workshops, plaintiffs were told about Legacy Dunes as a real estate investment opportunity. Both Aldeguer and DRG officer James Wear spoke at the workshops. Aldeguer and Wear told plaintiffs that Legacy Dunes was re-zoned to permit nightly rentals and they planned to convert Legacy Dunes to a hotel, but the process would take time because of the complex's existing tenants.

Plaintiffs were told they would receive immediate income from the long-term tenants who already occupied 94% of the units at Legacy Dunes and that they did not have to manage their units. Specifically, Aldeguer said rental income would be paid without the "headache of being a landlord":

> I want to buy this as a short-term property. It's going to take a while for this property to become a real hotel. Because there's people that are tenants. There are people paying $900 a month for that unit. Okay. I don't want the headache of being a landlord. What can you do for me, I said. . . .
>      And that's when I said, You know what, I want you to guarantee me that I don't have to do anything, I want the rental paid to me no matter what for at least one year guaranteed.
>      . . . .
>      . . . And management.
>      I don't want a phone call in the middle of the night in Chicago . . . saying my toilet's broken.
> . . . .
>      . . . Part of the inspiration is the management company, and I don't want to be in management. . . . So what we did is we brought in a management company that will manage the property for you just like a regular hotel room.

8

The workshop presenters identified defendant Geneva as the company that would manage the property for short-term (i.e., nightly) rentals. Geneva representatives were available to meet with plaintiffs after the workshop. In a PowerPoint presentation prepared by Geneva, plaintiffs were told they could conservatively earn monthly net income of about $1,244.13 on a two-bedroom unit that Geneva managed as a nightly rental.

The plaintiffs submitted sworn statements about what they were told at the workshops. Plaintiff Robert Devereaux, for example, was told that (1) Legacy Dunes would be converted to a short-term rental resort (also called "condo hotel" units); (2) the complex "would be managed with 80% of the rental going to the owner of the unit and 20% going to the management company"; and (3) "this would be a totally passive investment with no active participation required of the owners." Plaintiff Sandra Griggs was told "what a great investment property/investment vehicle [a Legacy Dunes unit] would be, especially since a) it would give owners excellent positive cash flow, and b) they predicted tremendous continuous appreciation here and in the Orlando area."

At the workshops, the plaintiffs were provided with information about the location of Legacy Dunes, floor plans of typical units, the layout of the complex, and the amenities offered. The plaintiffs were shown photos of the complex, floor

9

plans of various units, and maps of the surrounding area. REIG arranged on-the-spot financing following the workshops.

**D.     Purchase Agreements**

The plaintiffs purchased about 125 of the 488 Legacy Dunes units. The sales were effectuated through written condominium purchase agreements between LDC and the purchasers. Each purchase agreement stated the following in all caps on the top of the first page:

> ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503 FLORIDA STATUTES TO BE FURNISHED BY DEVELOPER TO A PURCHASER OR LESSEE.

The purchase agreements contained an "entire agreement" clause stating, <u>inter alia</u>, that "[n]o agent, representative, salesman or officer of the parties hereto has authority to make, or has made, any statements, agreements, or representations, either oral or in writing, in connection herewith, modifying, adding to[], or changing the terms and conditions hereof and neither party has relied upon any representation or warranty not set forth in this Agreement."

The purchase agreements notified the plaintiffs that, if there was a tenant currently residing in the unit purchased, the plaintiffs were buying the unit subject

10

to the lease. Otherwise, the plaintiffs received complete and permanent possession of their units.

Once the existing leases expired, each plaintiff was free to occupy his unit or rent it out to others. All rental income was unit-specific—that is, rental payments were not pooled together and divided among unit owners, but instead each unit owner received the net rental income generated by his own property.

The purchase agreements included an addendum containing, among other things, provisions on long-term rental management agreement, short-term rental, and temporary rental guarantee. The long-term rental management agreement provision stated that LDC agreed "to provide all leasing/concierge services" at LDC's expense until the first of: (1) June 30, 2007; (2) the date the purchaser of the unit occupied the unit; or (3) the date the purchaser of the unit placed the unit into a short-term rental pool. The provision further stated that owners of Legacy Dunes units "will be required to utilize and retain the leasing management company selected by the Board of Directors" of the condominium association. The provision prohibited plaintiffs from showing their units to prospective tenants without prior approval.

The short-term rental provision stated that (1) LDC acknowledged the unit purchaser's "intent . . . to place the unit associated with this Purchase Agreement

11

into a short term rental pool," and (2) should Legacy Dunes's zoning classification not permit short-term rentals within 120 days, LDC would refund $25,000 to the purchaser.

The temporary rental guarantee provision stated that, should the purchaser's unit become unoccupied, LDC would pay the purchaser the rent on the unit at the previous rental rate, less certain costs, during the same period during which LDC provided the leasing/concierge services—i.e., until the first of: (1) June 30, 2007; (2) the date the purchaser of the unit occupied the unit; or (3) the date the purchaser of the unit placed the unit into a short-term rental pool.

The purchase agreements stated that "[t]he nature and extent of the rights and obligations of the Purchaser in acquiring and owning the Unit will be controlled by and subject to the Declaration" of condominium for Legacy Dunes, and "Purchaser agrees to comply with all of the terms, conditions and obligations set forth therein." The plaintiffs acknowledged in the purchase agreement that they had received a copy of the declaration of condominium. The declaration of condominium for Legacy Dunes provided, "A condominium unit shall not be leased for a period of less than seven (7) months or as amended by the Board of Directors."

The plaintiffs signed their purchase agreements and initialed each page of

them.

**E.     Post-Purchase Losses**

The plaintiffs purchased their units in Legacy Dunes around September to December 2006.  Existing long-term leases began to expire, and Legacy Dunes units could not yet be rented on a short-term basis.

The Legacy Dunes unit owners obtained approval for short-term rental of Legacy Dunes units in summer of 2007.  As to the short-term leasing of Legacy Dunes units, the plaintiffs could choose their own management company to lease their unit, or they could do so themselves.

After 2007, rentals in Legacy Dunes dropped dramatically, and many plaintiffs went months without having any rental income at all.  The units depreciated in value.  The plaintiffs struggled to make the payments on their Legacy Dunes units.

**F.     Alunni Lawsuit**

The Alunni plaintiffs filed suit on August 8, 2008.  Their complaint, as amended, alleged that the defendants: (1) violated § 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (b), by selling unregistered securities; (2) violated § 15 of the Securities Act of 1934, 15 U.S.C. § 78o, by selling securities when they were not licenced to do so; (3) violated § 10b of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by engaging in securities fraud; (4) violated Florida and Illinois securities laws; and (5) engaged in common law fraud, negligent misrepresentation, and breach of contract. The Alunni plaintiffs asserted that their purchases of the condominium units constituted investment contracts which are considered to be securities under federal and state law. The Alunni plaintiffs sought rescission of the sales as well as damages.

The district court ordered the parties to conduct discovery on the limited issue of whether the condominium unit purchase agreements constituted securities. Following discovery, the parties filed cross-motions for summary judgment.

On August 18, 2009, the district court issued an 18-page order on the cross-motions for summary judgment. The district court concluded that the sales of the Legacy Dunes condominium units to the plaintiffs were not investment contracts, and thus did not qualify as securities for purposes of the federal securities laws. The district court granted summary judgment to the defendants on the plaintiffs' federal securities law claims. The district court declined to exercise supplemental jurisdiction over the state law claims, and dismissed them without prejudice.

## G.    Roggenbuck Lawsuit

On December 7, 2009, the Roggenbuck plaintiffs filed a separate lawsuit

14

alleging the defendants: (1) violated § 5(a) and (c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and (b), by selling unregistered securities; (2) violated § 15 of the Securities Act of 1934, 15 U.S.C. § 77o, by selling securities without a license; (3) violated § 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by engaging in securities fraud; and (4) violated the Florida Securities and Investor Protection Act by selling unregistered securities and selling securities as unregistered dealers. The factual allegations and requested relief were substantially identical to those in the Alunni lawsuit.

The defendants moved to dismiss or, alternatively, for summary judgment because, as the district court had held in the Alunni case, the sale of the Legacy Dunes condominium units did not constitute a sale of securities. The district court granted summary judgment to the defendants for essentially the same reasons given in the court's order in the Alunni lawsuit.

## H.    Appeal

The Alunni and Roggenbuck plaintiffs appeal the district court's grant of summary judgment to the defendants.[3] We consolidated the two appeals.

---

[3]We review de novo a district court's grant of summary judgment. Swisher Int'l, Inc. v. Schafer, 550 F.3d 1046, 1050 (11th Cir. 2008). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of fact and compels judgment as a matter of law." Id.

## II. DISCUSSION

### A.  The Howey Test

The federal securities laws on which the plaintiffs base their claims against defendants—the Securities Act of 1933, the Securities Act of 1934, and the Securities Exchange Act of 1934—all define "security" as including, among other things, "investment contracts."  See 15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  Although the definition of security extends to things other than investment contracts (e.g., stocks, bonds, and notes), the parties here agree that "investment contract" is the only portion of the definition that arguably applies.  Therefore, if the sales of Legacy Dunes condominium units do not constitute investment contracts, then they are not securities, the securities laws do not apply to the transactions, and the grant of summary judgment to the defendants is appropriate.

In Securities & Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S. Ct. 1100 (1946), the Supreme Court set forth the test for whether a transaction qualifies as an investment contract for purposes of the securities laws:

> [A]n investment contract . . . means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

16

Id. at 298-99, 66 S. Ct. at 1103. The three elements of the test are: "(1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others." SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1199 (11th Cir. 1999) (quotation marks omitted).

There is no dispute here that the first prong of the Howey test, an investment of money, is met. The parties' dispute concerns whether the second and third prongs are satisfied.

"A common enterprise exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.'" Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990) (quoting Villeneuve v. Advanced Bus. Concepts Corp., 698 F.2d 1121, 1124 (11th Cir. 1983)). We have held that "the fact that an investor's return is independent of that of other investors in the scheme is not decisive" because "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the promoter." Unique Fin. Concepts, 196 F.3d at 1199 (quotation marks and brackets omitted).

As to the expectation of profits solely from the efforts of others prong, "[w]e have held that 'solely' is not interpreted restrictively." United States v. Wetherald, 636 F.3d 1315, 1325 (11th Cir. 2011) (quotation marks omitted).

17

Instead, we "look[] to the economic reality, focusing on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party." Id. (quotation marks omitted). "An investor who has the ability to control the profitability of his investment, either by his own efforts or by majority vote in group ventures, is not dependent upon the managerial skills of others." Gordon v. Terry, 684 F.2d 736, 741 (11th Cir. 1982). "The fact that the investor has delegated management duties or has chosen to rely on some other party does not establish dependency. The investor must have no reasonable alternative to reliance on that person." Id. at 741-42 (quotation marks omitted).

**B.    Analysis**

We agree with the district court that the facts of these lawsuits establish that the plaintiffs' purchase of condominium units in Legacy Dunes did not constitute "investment contracts." The plaintiffs purchased fee simple interests in real estate, subject only to: (1) the condominium declaration and bylaws; (2) each unit's existing long-term leases (for those that units that had tenants), until they expired; and (3) a one-year period during which the plaintiffs had to lease their units (if they chose to lease them) through Sovereign, the property management company selected by LDC. Once the existing leases expired, the plaintiffs were free to lease their units or occupy the units themselves. And once the condominium association

18

(in which plaintiffs had representation after LDC turned over control in September 2006) approved short-term leasing in 2007, the plaintiffs were free to choose whatever management company they wished. Moreover, during the one-year period in which the plaintiffs were locked in to using Sovereign as their leasing agent, the plaintiffs had a temporary rent guarantee that paid them the rent on their existing leases even if their units became unoccupied.

Under these facts, neither the "common enterprise" nor the "expectation of profits solely from the efforts of others" prongs of the Howey test are satisfied. The fortunes of the plaintiffs were not "inextricably tied" to the defendants' efforts, see Unique Fin. Concepts, 196 F.3d at 1199, because once the plaintiffs' rent was no longer guaranteed, they were free to control their units themselves. For the same reason, the plaintiffs were not dependent on management skills of others because they had the ability to control the profitability of their individual condominium units.

Plaintiffs' attempt to analogize their situation to that in Howey is unpersuasive. In Howey, the Supreme Court found that the sale of units in a citrus grove development, coupled with a ten-year, non-terminable lease-back and service contract for operating the unit in the grove, constituted an investment contract. Howey, 328 U.S. at 294-301, 66 S. Ct. at 1101-04. The Supreme Court

19

noted that: (1) the units were sold in narrow strips that were not separately fenced and "the sole indication of several ownership [was] found in small land marks intelligible only through a plat book record"; (2) the owners of particular units had no right of entry into the grove and no right to specific fruit; (3) the owners of the units in the grove lived out of state and lacked the requisite knowledge, skill, and equipment to cultivate citrus trees; and (4) the produce was pooled and the grove operator was "accountable only for an allocation of the net profits." Id. at 295-96, 66 S. Ct. at 1101-02. The Supreme Court concluded, under the circumstances, that the coupled transaction was an investment contract:

> The transactions in this case clearly involve investment contracts as so defined. The respondent companies are offering something more than fee simple interests in land, something different from a farm or orchard coupled with management services. They are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents. . . . Indeed, individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments. Their respective shares in this enterprise are evidenced by land sales contracts and warranty deeds, which serve as a convenient method of determining the investors' allocable shares of the profits. The resulting transfer of rights in land is purely incidental.

Id. at 299-300, 66 S. Ct. at 1103-04 (emphasis added).

20

Here, the transfer of rights in land was far from incidental. Cf. United Hous. Found., Inc. v. Forman, 421 U.S. 837, 840, 847, 860, 95 S. Ct. 2051, 2054, 2058, 2064 (1975) (concluding that purchase of stock shares "entitling a purchaser to lease an apartment in . . . a state subsidized and supervised nonprofit housing cooperative" did not constitute investment contracts because purpose of buying shares was to enable holder to occupy apartment); Rice v. Branigar Org., Inc., 922 F.2d 788, 789 (11th Cir. 1991) (concluding sale of lots in housing development and equity memberships in development's country club were not investment contracts). As opposed to Howey, the transaction here was not something more than a fee simple interest in land coupled with (temporary) management services by a company selected by the seller. Nor is third-party management absolutely essential here, as it was in Howey.

Plaintiffs contend that third-party management was essential because the plaintiffs all lived in the Chicago area or other areas similarly far from the Kissimmee, Florida location of Legacy Dunes. Additionally, they contend that they all purchased their Legacy Dunes units as investments and not for their own use. However, plaintiffs had other options that did not entail the use of third-party management. Even if purchasing the units as an investment, a plaintiff could have chosen to re-sell his unit for a profit either before or after the existing long-term

21

lease expired. Or a plaintiff could have chosen, once the one-year Sovereign exclusivity period ended, to lease his unit himself or through another rental agency. We note in this regard that the real estate rentals at issue here do not entail the kind of specialized knowledge or equipment present in many cases that have found third-party dependency. Compare Howey, 328 U.S. at 296, 66 S. Ct. at 1102 ("[The investors] are predominantly business and professional people who lack the knowledge, skill and equipment necessary for the care and cultivation of citrus trees."), and Eberhardt, 901 F.2d at 1581 (finding investors in cattle embryos had to rely on third-party maintenance services "because of the technical nature of the embryo operation"), with Williamson v. Tucker, 645 F.2d 404, 425 (5th Cir. May 20, 1981) (finding plaintiffs, who were partners in real estate partnership venture, were not dependent on defendant's real estate management, sale and lease services even though venture's real property "would ultimately have to be developed or sold, and in the interim managed, before a profit could be returned on it"; the Court found that "[t]he plaintiffs must allege that [defendant manager] was uniquely capable of such tasks or that the partners were incapable, within reasonable limits, of finding a replacement manager").

The bottom line is that the plaintiffs had some "ability to control the profitability of [their] investment." Gordon, 684 F.2d at 741. The fact that the

22

plaintiffs "delegated management duties or [chose] to rely on some other party does not establish dependency." Id. at 741-42.

The plaintiffs argue that the representations made at the real estate workshops run by Aldeguer focused exclusively on the investment character of the Legacy Dunes units and extolled the effort-free profit available from short-term rentals of the units arranged by the promoters' hand-picked management company, Geneva. Although it is true we must consider "the promises and inducements held out to investors . . . in determining whether or not a particular transaction is a security," Gordon, 684 F.2d at 740 n.4, here the purchase agreements made abundantly clear that oral representations—at the workshops or otherwise—were not a part of the parties' agreement. The parties' actual written agreement demonstrated that it was a real estate purchase agreement, that many of the units were subject to existing long-term leases, and short-term leasing was not immediately available.[4] Moreover, the parties' agreement did not contain any guarantee as to rental income past the first year. Despite the defendants' rosy forecasts, what they actually offered plaintiffs was the purchase of real

_____

[4]Although the oral representations made at the workshops emphasize the short-term rental income expected from the Legacy Dunes units, no one at the workshop promised, or even suggested, that short-term rentals would be available soon or at any fixed time. Nor did anyone state that plaintiffs must use Geneva or any other short-term manager selected by defendants.

23

estate—ownership of units in a condominium complex, with a one-year required long-term leasing agent and a contemporaneous period of guaranteed rental income. This was a real estate contract, not an investment contract.

## III.  CONCLUSION

For the reasons set forth above, we affirm the district court's grant of summary judgment to the defendants in both lawsuits.

**AFFIRMED.**